2-18-0913 The Highview Group, Ltd. v. Thomas and Swire, Natives, Police, and William Ryan Homes, Inc. and North Shore Builders, Defendants, and Puppets. On behalf of the opponents, Mr. Charles Barry Montgomery. On behalf of Anthony, Mr. Joseph T. Morrison. Good morning, Counsel. Mr. Montgomery, you may step forward. At first sight, I appreciate that you're hearing this case and I appreciate being here in the Second District. I've been practicing law for a lot of years, but this is my first trip out here to the Second District. You're welcome. Thank you for having me. Quote. That's Mr. Swire. That's the plaintiff. That's why he believes he's entitled to $510,000. He's not. Why are we here today? Well, didn't Brian Homes use the plat and the survey? No. You say, didn't they use the plat and the survey? They used a plat and a survey and with respect to what they did use, any developer would have used the same thing. Weren't the plans substantially similar and didn't that demonstrate that they had value? No. Why not? Because any developer that would have come in and developed this property would have this piece of property. You have to be a land developer to understand this. Mr. Ryan explained this. This is a finite piece of property. What is it, 43 acres or so? Basically, it lays out, if you're going to be building there, the restrictions and the requirement basically puts you into the same footprint. He did not obtain a benefit. He did not use this idea, this vision that the plaintiff claimed that he had. He did not use that. That is throughout the record. You read this record, you will find that he did not use that. He did not use the vineyard. He did not use that concept. That was his vision. That was his vision. Whose vision? Pardon me? Whose vision? That was Swerdow's vision, to do this vineyard. Ryan did not use that. My point is simply this, that if this is unjust enrichment here, that a speculator, which is exactly what Mr. Swerdow is not a developer, he's a speculator. He said, I think that this property could be worth some money. It could be developed. And basically, he hired an engineer. He certainly incurred some expenses in doing so. He certainly spent his time and effort in doing so. But the point is this. You're sitting here as judges in this case as an equity, a court of equity. Is it fair? If it's fair that $510,000 is paid to Mr. Swerdow, the speculator, then anybody who develops a piece of property and does work on it is going to, and the deal falls through, and they had some work that was done by somebody else, they're going to file an unjust enrichment case. The precedent would be horrendous. There are speculators that buy property to develop them all the time. I don't know the number that are successful, but we can just drive around and you see many, many areas where there's a few houses, and it's obviously there's a gate out there. There's an entrance. And for several years, it sits, and you don't make any money on these, Mr. Ryan has testified in this case. You don't make money on these cases unless it's successful. And here's another question. Why should Mr. Swerdow be paid a half a million dollars? Was this a successful project? Whose burden is it to establish what he says here, you made a profit? You made a profit. Where does that come from? Where is the evidence in this case, you won't find it, that Ryan Holmes made a profit? There is absolutely no evidence of that. And that is the typical case. In my experience, unjust enrichment is the sort of the bottom of the barrel. It's the last clear chance. It's what a speculator uses when all else fails, which is exactly what happened here. This case when it was tried in the court, virtually the record has to do with the claim of Mr. Swerdow that he entered into an oral contract. And there was much testimony, much testimony, that was the major money. He was asking for millions of dollars saying, look, Mr. Ryan, you agreed to be my partner. And because you didn't become my partner, I've lost all this effort that I put in. Starting, by the way, in 2010 is when Mr. Swerdow first decided that he as a non-builder, but as a speculator, would run this risk of trying to find a partner. Now, we all know, it's fundamental here, that unless you are the owner of the property, Mr. Swerdow undertook and incurred all these expenses to the extent that he paid for them. And by the way, the record shows he didn't pay for all those. But he owed money to Black, his engineer, had a contract with him. Evidence shows he never didn't pay it. He was a speculator, and by the way, in an equity case, if you're coming in and asking for equity, as we all know, you have to do equity. You have to come with clean hands. Mr. Swerdow doesn't come with clean hands. He accused Mr. Ryan of stealing. That was his original, he had fraud case. He finally figured out that the plaintiff did, that he's not going to be able to succeed on that, but that was the original complaint. I think we're going maybe a little far afield. If there was no evidence in the record of detriment, why wasn't a directed finding at the close of the case granted? In my opinion, there should have been. But that's not, I don't say that the judge, I mean the judges do what they do. I've been trying cases all my life. I've asked for remedies at the end of the case that I thought I was entitled to but I didn't get. But I don't think that is the issue in this case. The issue now is, now you have before you, you have the record in front of you. You can see all of this and make a determination as to whether or not, in fact, as the law requires, that the defendant has been unjustly, has unjustly retained a benefit. Let me ask you this. Is there evidence in the record upon which the jury could have faced its verdict that your client used these plans in order to develop this property? Is there evidence that we used these plans to develop the property? Right. There is evidence that we, well there's lots of evidence in the case with respect to plats, diagrams, plumbing, where the sewerage would go and all of that. But the fact of the matter is, Mr. Ryan and his group had to go back. These are called entitlements. Those entitlements that Mr. Swartow obtained, as we all know, there's no issue on this. They all expired, meaning they were of no value. That's admissible. Right, right. I understand that. Yes. But I'm getting back to my question. Is there any evidence in the record that your client used these plans? Because, I mean, we know about the entitlements expiring. But didn't your client actually tell Wescott that the entitlements had value? Because, I mean, even if they were expired, it shows that the city would be inclined to approve plans that were similar or the same as the plans set forth by Swartow. Yeah, I don't clarify that. And that's a good question. Yes. They did have value. The plans did have value. The entitlements back in 2014, that's when Mr. Ryan met with Mr. Swartow. And, by the way, as you know, the time frame in which they met is only a few weeks before these entitlements expire. Mr. Swartow was in a frenzy to find a partner. He couldn't afford, we know that, to buy this property. So he came in and he talked to Mr. Ryan. And there is no doubt. You're absolutely right. Those entitlements at that point in time had value. And if Mr. Ryan had purchased the property and obtained the signature of Riley on the plaque and validated those entitlements, I wouldn't be standing here. I understand that. But my question is, didn't the entitlements, even though expired, still have value because it showed that the city would be inclined to approve a project that was the same or at least extremely similar to the one they've already approved when your client puts it forward later? No. And I'll tell you what. When my client put it forward later, remember, he purchased the property three years later. So are you saying that you're going to put, you absolutely know unequivocally that the city of Lake Forest is going to approve everything that it approved three years prior? Well, his first offer was prior to three years. His first offer wasn't accepted. He did make an offer right away. But once that offer expired, and that's my point. Once that – actually, the offer expired and Mr. Ryan lost a lot of money. His down payment on that property, he forfeited. He forfeited. So at that point in time, this is in 19 – 20. No. 20. No, not 20. It's in – 2014 was the first offer. June 2014. His contract expired in 2016. And then he made a new offer in 2017, which was accepted. It wasn't the same offer. It was a reduced offer. My point is in 2016, it is our position that once those – all those entitlements expire, and once they expire, to your point, does it give some indicia that the City of Lake Forest is likely to approve? Of course, it wasn't the same idea. Well, it's pretty close. Instead of a vineyard in the middle, there was an orchard in the middle. But other than that, it didn't seem like there were significant differences. Well – In terms of a general concept. Mr. Swartout, what was unique with Mr. Swartout, and what I'm saying is any developer – Swartout's not a developer – any developer that came in here would have a plan that's very similar to what anybody else would have. I don't know why you – how do you say that when, in fact, Swartout came in, the City of Lake Forest has zoning as far as lot sizes, and he actually – his vision was to reduce the lot sizes. See, he had to go get approval for that, first of all, correct? I think the zoning permitted the reduced size. No, they had to go get a variance, as I thought that was in the record. Well, that – you – I don't know the answer. Well, that's my recollection. I mean, there are things in this plan – and Black testified down to minute measurements that were exactly the same on the plats that were – had the tentative approval with the entitlement, and then the ones that were ultimately presented to the city by your client, down to, like, exact measurements. Did he not? Yes, he did. There were – there's no question that even if Mr. Ryan hadn't bought it, in my opinion, a new developer that had come in that had nothing at all to do whatsoever with Swartout would have had drawings that would be very, very similar. That's the point. You have to be a developer to understand that. When you have a piece of property that you're going to – Wait a minute. So you're saying that given this unique piece of property, the only reasonable way to have developed it was the way that both of these plans came up. Is that your position? That's – well, that's – there's testimony to that fact. That basically, when you have a piece of property, when you say unique property, every property, I suppose, is unique in a sense. But if you're going to develop it and you're going to put the maximum number of homes that can be there, every developer that comes in, depending on unless they're going to build big homes, but if you want to maximize it, which Ryan did and which Swartout did, you're going to come up with basically the same plan. That's the point. Well, if you're going to maximize it, wouldn't you double-load the street? I mean, I thought there was testimony that normally a developer to maximize the number of houses would double-load the street. Both these plans had the street single-loaded. Well, yes, both of them had a single street. So how does that maximize the number of lots on the property? But it maximizes to the extent that if you're saying, okay, I'm going to leave this open area here, and what you're basically saying is no other developer is going to come in and have an open area? If you're going to have an open area, I'm not a developer either, but all I know is that the indication is that any developer that's going to come in here is going to open it, unless they do something completely different. And this is not a unique idea, by the way. And, by the way, Swartout, he never claimed it was unique until he filed this lawsuit. It's not a unique idea. He did nothing. This is not a trade secret. He did nothing to protect it. He voluntarily gave all this material. So what's the precedent that's set here if you give him? That means somebody that develops a piece of property that has plans, what they do is they'll come up and they'll say to the potential owner, here, take all these plans. They're wonderful plans. Take them. I'm not stealing them. Take them. And, by the way, then sit back, and if the owner decides to use those plans down the road, he files a lawsuit for unjust investment. Counsel, your time is up. You'll have time on rebuttal. Thank you. Thank you. Mr. Morrison.  Good morning. May it please the Court and counsel. First of all, about when we were talking about this in Montgomery, the property that was zoned in the city of Lake Forest, but it also had what was called a historic preservation of older land. That's unique to Lake Forest. And what that allowed was for someone like Mr. Swarthout to develop a vision for the property which was different than the normal subdivision. There's evidence in the record from Mr. Teska, and there are exhibits in the record, as to how a conventional subdivision would have looked on this property. Okay? So to suggest that any developer would have developed this property exactly the same way, that's not based on the record. The record is the opposite of that. Okay? This was a unique vision of Mr. Swarthout because he was going to downsize the lots from the regular lot, permitted lot size, to create this open space for what he was going to use as a venue, which they used, as you pointed out, as an orchard. Other than that, the plan, as we pointed out at trial, there was a big argument at trial about whether or not this was similar or not similar or what were the differences and what were the similarities. It was up to the jury to decide that issue. And I think that the jury could have found that Mr. Swarthout's plan had unique ideas. Mr. Montgomery suggested, well, anybody can go to the village and just get the plans. No, you can't. Those plans aren't subject to the Freedom of Information Act. Well, even if it was similar, what's the detriment to your client once the entitlement is expired? Well, first of all, we have to talk about benefit and detriment, okay? In looking at this case, we have to look at what the benefit was to them, okay? The detriment was is that Mr. Swarthout voluntarily gave all this information to them, hoping to partner with Brian Holmes, thinking he had a partner with Brian Holmes. Brian Holmes then went to the owner and stole the project. Well, I mean, so Mr. Swarthout had an expert. Well, the definition is one side has to, it's one coin, two sides. One side retains a benefit to the detriment of the other side. Correct. Let's assume for a moment that the plans were given. They used the plans. The plans were similar. They retained a benefit. Let's look at the other side of the coin. What was the detriment to your client by them retaining that benefit when your client really had no project anymore? The entitlement's expired. There is no more project. The project is gone. But Brian doesn't have the project either without us, okay? So the detriment is is that we gave all of this information to Brian. Brian used the plans. It didn't pay us for any of that money. That's the benefit. What's the detriment to your client? The detriment is is that we didn't get any money for these plans. You gave them up. You just said, here you go. With the expectation. But an expectation, I mean, so you were wrong. You picked the wrong guy to deal with. Where's the detriment to your client who voluntarily gave up these documents? Well, the detriment is that, number one, they stopped looking for other partners, okay? They could have gotten other partners to try to, or they could have figured out some other way to keep the entitlements in place, okay? But on the 20th, they assumed that Brian was going to act on their behalf and make an offer to the owner, which was, in fact, information that had been obtained by Brian from Swartha. Swartha gave them the information that even though the property is listed for sale at $16 million, the owners will take 10. How do we know that? They had a prior letter of intent with Jacobs for 10. And the testimony in the record was that they, Swartha and Mr. Hanson and Mr. Wescott, expected that that offer would mirror the Jacobs offer so that there was a good possibility that the owners would accept it and then agree to sign the plan. That was, the detriment was, is that that all got lost. It all got lost when Brian goes off on his own. Remember, the testimony from Mr. Ryan and Mr. Wescott was when we approached the Reilings, we were doing it on our own. We weren't doing anything. Well, how did that happen, okay? So, I think in this case that there is evidence of a detriment because they get to keep the million dollars that they would have paid Swartha. Remember that there was testimony from Mr. Ryan in his plans for 2021 that said, we envisioned the deal that if we have to buy out of one deal for $10 million, that Mr. Swartha would make up to a million dollars throughout the project. So, the detriment is you didn't get the million dollars. You didn't get anything, okay? And that's what Mr. Ryan told him on the 12th, okay, that he was going to get back. So, the detriment is, A, he lost the ability to try to develop the property and keep the entitlements in place through other means, and B, he didn't get paid any money that he was expecting to get paid from Mr. Ryan. It wasn't a question of, are these plans valuable? Does Ryan expect to pay some money for that? The only question between Swartha and Ryan was, how much? That was the only issue that was left between them. And that the jury then found that there was no acceptance, that there was no implied contract in fact, okay? But this is an implied contract in law. And the theory of unjust enrichment is an equitable remedy based upon a contract that's implied in law. Contract is implied in law by a jury if benefits confirm. So, clearly here, you had a jury that found specifically that there were benefits given. They don't appeal from that finding. They don't appeal from the finding that benefits were given, okay? They never made a motion for a directed verdict. Said we need to prove damages. Never made that motion. Only after the verdict comes in, oh, oh, you didn't prove damages. Well, I think we did. I think we proved damages in that, number one, they got a property that was listed for $16 million. They got it for $10 million. That's not a bad value. Two, we didn't get up to the million dollars that we were promised. Three, there's evidence in the record that there was a million that the property was, by this property, you put all the improvements in, the roads, everything else. But Mr. Westcott estimated that the net profit after you did all that and you sold the lots at about $600,000 a lot, if you were doing just lots, that the profit would have been a million six. Is there a requirement, as counsel argues, for you to show that this project actually turned a profit? Well, no, because, first of all, I mean, back to what the facts are. The facts are they make a letter of intent at the end of June of 2014. They sign a letter of intent, okay? They sign a contract to buy the property in August of 2014. That contract is in the record. They then went to the city of Lake Forest and went through the approval process to get approval of the plans that were, I suggest the record shows, suggested similar to Mr. Swarthout's plan. It was only, and then after that fact, they had a problem getting the financing together to close the deal.  Just as it happened with Mr. Swarthout, the rallies kind of got fed up with the fact that this property would be closing, and the contract ended up being terminated. Only a year, less than a year later, he goes back to them and says, look, I've already given you some money. That money's been forfeited as a down payment. But if I pay an additional $9 million, can we do the deal? And they said yes. So they don't do this deal if they're not going to make a profit, okay? I don't think I have to prove the amount of the profit. The mere fact that William Ryan Holmes is undertaking this project means that they think it's going to be profitable, right? So I think all I had to prove was the fact that William Ryan Holmes did undertake this project, and in fact did undertake exactly the same project that we paid for. You know, the surveys are going to be the same. The topography is going to be the same that we gave them. The engineering Mr. Bleck testified was substantially similar to his engineering. That was not his engineering. And so you have a situation where the plaintiffs provided this benefit, which the jury found, and which there is no appeal from. And was there a detriment? Now, don't focus on the loss to the plaintiffs, okay? That's not the focus. Focus on the detriment. What's the detriment? Well, the detriment is they gave them something with the expectation that they would get something in return, right? It's like somebody doing work for somebody. You do work for somebody, you expect to get paid. They say, oh, no, we didn't have a contract. We're not going to pay you. I'm just an enrichment. What's the detriment? The detriment is that he did the work, expected he'd get paid. Mr. Schwartz gave him this and expected he'd get paid. And somebody gave it to him gratuitously. Well, that's not true. Mr. Ryan wanted it all, got it all, and then the evidence was that we thought we had a deal. So it's not just we gave them all the plans and they decided to walk away, and then they ended up doing a deal that's similar. That's not what happened. What happened is they took all our plans. They used all our plans. They used the information as to how to buy the property. The fact is that they knew that the city of Lake Forest would approve this plan. That was extremely valuable, and Mr. Schwartz out testified to that. And so you have a situation where this was not, as Mr. McElroy suggested, that Mr. Schwartz was a mock speculator. Well, I don't know where that comes from. He's a developer, just like Ryan owns it. He just has the financial wherewithal to put not $10 million in the project, but he put $1 million in the project. And that's another, and how do you value what the jury did? Well, Ryan, Schwartz spent $1 million. Ryan spent $300,000 to $500,000. Ryan saved $500,000. That's one way to calculate it. The other way to calculate it is to say, well, the jury looked at plans exhibit 21, said $250,000 initially on the down payment, another $250,000, $400,000 per fee, and it was $10,000 per lot, and they gave him one lot. Okay? So to suggest that there's no evidence in the record that the jury had to justify this verdict, this is not true. There's no requirement that I needed an expert. And some of these damages, they're not exact damages. You know, what was the value of getting the property for $10 million versus $16? I don't know if it's six or three or one, but it's certainly a benefit that the jury could have considered. So I think that we've done all of them. We proved unjust arrest. Unjust arrest is exactly the remedy in this case. When somebody gets something gratuitously from the other side, expects something in return for it, they keep it, they use it, but they don't pay for it. The law on that says that's not fair. That's not equitable. You can't take our plans, use our plans, and somehow say, well, we don't owe you anything, when they use the very information that we gave. Remember, we gave them permits. The North Shore Sanitary District, we had to annex that. We annexed that. They got that. We got the permit for the water and the storm sewer and the wetlands and the Army Corps. We got all those permits. Now, some of those expired, some didn't. But it was just a matter of reapplication. That was the evidence. All you had to do was reapply. Was there expert testimony introduced with respect to any of these damages? And did there need to be? There was not. I did not have an expert testify. And I'm suggesting to the Court that an expert was not needed. First of all, there's no law that says it's needed. And second, I think that there was evidence of the numbers, as I've described. So I don't think, based on that evidence that was in the record, I don't think that an expert would have added anything. And I don't know how an expert could opine on some of those damages, like the $10 million versus the $16 million. How does an expert opine what the value is to the developer? I don't know. I don't know if an expert could do that. So I don't think that an expert was required. This is a case where they're asking. I'm going to finish your sentence. You can finish your sentence if you wish. My final point would be, thank you for letting me finish, is that they're asking for judgment NOV, okay, which is, you know, you all are aware of the standards, the very high standards that they have to meet for that. There's absolutely no evidence that no contrary court could ever stand. I think the record is clear. And the argument of the defendants at trial and here is that what we got had no value. They keep repeating it, repeating it, repeating it. And yet the jury found against them and found that they had a benefit, which they never appealed for. Thank you. Thank you very much, counsel. Mr. Montgomery. Counsel, if I could start off by asking a question. I spoke to opposing counsel about this coin with two sides. I asked him questions that you raised in your brief about detriment. Let me ask you about benefit. You don't raise an issue, an appeal, that your clients receive no benefit from the plaintiff's efforts. Yeah, let me clarify that. Our position is that at the time that we went back and bought the property in 2017, there was no benefits. Let me just read this to you. This answers the question. This is at the trial in 2018. This is Mr. Ryan testifying. This is the question by plaintiff's counsel. And is it your testimony that Mr. Swartow's layout and Mr. Swartow, the fact that he had gotten the previous permits and the previous, notice the word previous, previous zoning from Lake Forest, none of that gave you any value at all? That was just absolutely worthless. Is that what your testimony is? Mr. Ryan's answer. At this point, 2018, at this point, as we sit here, my knowledge is we gained no benefit from Mr. Swartow's work. That's the testimony in the case. The point is, was there a benefit back in if he had purchased the property and actually developed it back at the time when he, when Mr. Swartow's entitlements were in effect, yes, there was a benefit there. And, you know, I can understand the fact that you say, well, Mr. Swartow went to the expense, although he didn't pay for it, of getting all of these entitlements. Doesn't that tell you something? I suppose you could say yes, but it doesn't tell you that when Mr. Ryan went back in to do it, the same thing wouldn't have occurred. The city of Lake Forest would have done the same thing. So what really did Mr. Swartow's, what benefit really was there? And what I'm hearing here is that the detriment that was never quantified, I don't see any detriment whatsoever. Take the position that Mr. Swartow, when Mr. Ryan walks away from the project, which he did, forfeits literally close to a million dollars in earnest money. There were some extensions with respect to that contract, but he forfeited all of them. And at that point in time, what if Mr. Ryan had not come back? Mr. Swartow has the same argument. Mr. Swartow says, we expected when we spoke with Mr. Ryan back in 2014, we were going to get something. That's the detriment. That's what he just said now. We expected getting something in return. That's the detriment. That's not a detriment. Absolutely unequivocally, that's not a detriment. What about giving up the opportunity of finding someone with whom to partner on this? Mr. Swartow never gave that up. He could have gone out. He was not led to believe that they had a partnership and that the offer that was made in 2014 was going to be made on behalf of both of them. He knew within two weeks of that discussion. Mr. Ryan, the evidence shows, spoke to Mr. Mediman in person twice, spoke to him on the phone a couple times, and Mr. Swartow knew that there was going to be no deal. Mr. Ryan never agreed. And the jury, he's trying to relitigate his contract, actually. The jury turned that down. He said no, there was no deal. There was no agreement, no meeting of the minds. And yet that's the detriment. To read between the lines, the jury very well may have thought that your client was stringing him along until the entitlements expired and then put him in his own bed on the property immediately thereafter. That was a period of about two weeks. And Mr. Swartow had been working on this project since 2010 for over four years. And Mr. Ryan comes in and he's supposed to give him an answer within two weeks, and Mr. Ryan decided no, no, I don't like the deal. He made a proposition which was turned down. We know that. It's in the record. He made a proposition when he was talking to him, and Mr. Swartow said no, I don't accept your deal. So Ryan, who is sophisticated in these matters, said then we don't have a deal. When was that in relation to the June 12th e-mail? The June 12th. That your client lays out all the scenarios where the plaintiffs are going to be compensated for what they've done so far. That was within a time frame of a few days. All this was happening within the time frame. They first met right in that time frame of the June 12th e-mail. I don't have it in front of me and so forth. And all of this occurred. All of this transaction occurred. Mr. Ryan is expected to enter into a deal. By the way, that's been litigated. The jury said there was no deal. And the fraud count, which he tried to say, well, you know, he defrauded me, they voluntarily dismissed that. So they reached into this, as I said before, sort of this last clear sheet. But let's go to the equity. And that's my point, Your Honors. Counsel, do you want to wrap up, please, sir? Your time has expired. And I'm sorry, we have another case this morning. Thank you. My last sentence is this. To give Mr. Swerdow, and he's absolutely true, no benefits, no money that Ryan has ever made, that's his burden, not ours. Equity says that this is not a case that equitably you should pay a half a million dollars to somebody that thought they had a deal, but didn't. And that's really the case. Thank you. Thank you very much. Thank you, Counsel, for your arguments this morning. Thank you. The Court will take the matter under advisement and render a decision in due course. We stand in recess until the last case.